1

**Paul Arons, State Bar #84970**
2
**LAW OFFICE OF PAUL ARONS**
**685 Spring Street, #104**
3
**Friday Harbor, WA 98250**
**Tel:  (360) 378-6496**
4
**Fax: (360) 37806498**
**lopa@rockisland.com**
5

6
**Attorneys for Plaintiffs**

7
**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
8
**SAN JOSE DIVISION**

9

10
| | |
|---|---|
| **RICHARD L. CARRIZOSA and MARY PEA, on behalf of themselves and others similarly situated,** | **CIV. NO.  05-2280 RMW** |
| | **CLASS ACTION** |
| **Plaintiffs,** | **DECLARATION OF PAUL ARONS IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL FURTHER DISCOVERY** |
| **vs.** | |
| **PAUL R. STASSINOS, et al.,** | **Date:  May 17, 2006** |
| | **Time: 9:30 a.m.** |
| **Defendants.** | **Courtroom 4** |

11

12

13

14

15

16

17
        I, Paul Arons, declare as follows:

18
        1.  I am one of plaintiffs' attorneys in this action and I make this declaration
19
in that capacity.
20
        2.  On October 10, 2005, plaintiff Richard Carrizosa served on Legal
21
Recovery Services of Central California, Inc. a request for production of documents, and
22
a set of ten interrogatories,.  LRS of Central California served its initial response to
23
plaintiff's document production request on November 14, 2005, and its initial interrogatory
24
response on November 23, 2005.  On November 29, 2005, plaintiffs wrote defendant,
25
requesting an opportunity to meet and confer concerning the discovery.  The parties met
26
and conferred on December 9, 2005 for at least 1.3 hours.  Defendant served
27
supplemental discovery responses on January 4, 2006.  Plaintiff wrote defendants on
28
January 17, 2006, requesting that the parties meet and confer concerning these

**DECL. OF PAUL ARONS IN SUPPORT OF MOTION TO COMPEL FURTHER DISCOVERY: Page 1**

supplemental discovery responses.  The parties met and conferred on January 26, 2006

for at least thirty minutes.  LRS Central California agreed to provide a few additional

interrogatory responses.  These were served on February 10, 2006.  The present motion

does not concern the February 10, 2006 responses.

3.  I am filing herewith as an Appendix, defendant Legal Recovery Services

of Central California, Inc.'s response to plaintiff Richard Carrizosa's written discovery at

issue in this motion.

| Appendix | Date | Description |
|---|---|---|
| 1 | 11/14/2005 | Response to Plaintiff Richard Carrizosa's Request for Production of Documents |
| 2 | 11/23/2005 | Response to Plaintiff Richard Carrizosa's Interrogatories |
| 3 | 01/04/2006 | Supplemental Response to Plaintiff Richard Carrizosa's Request for Production of Documents |
| 4 | 1/4/2005 | Supplemental Response to Plaintiff Richard Carrizosa's Interrogatories |

4.  One of the documents that this defendant produced in response to

plaintiff's document production request is a redacted copy of a document titled "Articles of

Agreement", dated October 8, 1996, purporting to be an agreement between Legal

Recovery Services, Inc. and Brenda Meadows.  A copy of that document is attached to

this declaration as Exhibit 1.

5.  I am attaching as exhibits excerpts from the following depositions taken

in the related case, *Palmer v. Stassinos*, Civ. No. 04-3026 RMW (U.S.D.C. N.D. Cal.)

| Exhibit | Date | Deposition |
|---|---|---|
| 2 | 04/01/05 | Paul R. Stassinos |
| 3 | 06/06/2005 | LRS, Inc. (Alan Mecham) |
| 4 | 09/29/2005 | LRS, Inc. (Adam Perry) |

**DECL. OF PAUL ARONS IN SUPPORT OF MOTION TO COMPEL FURTHER DISCOVERY: Page 2**

6. I am attaching as Exhibit 5 copy of Defendant's Supplemental Opposition to Motion for Class Certification, filed 2/09/2006 in, *Palmer v. Stassinos*, Civ. No. 04-3026. In this brief, defendant Stassinos argues that a class action is not superior to other forms of adjudications, because the class will not benefit monetarily. This is a routine defense argument in class actions, which is routinely rejected by most courts. See e.g., *Amchem Prods. v. Windsor*, 521 U.S. 591, 619, 117 S. Ct. 2231 (1997). *Ballard v. Equifax Check Services, Inc.,* 186 F.R.D. 589, 600 (E.D. Cal. 1999). Nonetheless, since Mr. Stassinos has previously made this argument, there is no reason to think he will not do so again.

7. In connection with litigation in this action and in *Palmer v. Stassinos*, I have reviewed numerous check collection lawsuits filed by defendant Paul Stassinos and court docket entries concerning such lawsuits, in counties throughout Northern California. In these lawsuits, Mr. Stassinos uses a form complaint and pleadings, and seeks entry of a default judgment within days of the expiration of the defendant's time to respond. Almost all lawsuits result in a default judgment. In my review of these lawsuits I have come across a few lawsuits where the defendant filed an answer. None of these cases went to trial and I have not seen any indication that Mr. Stassinos ever attends a court hearing to represent the plaintiffs in these actions.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed in Friday Harbor, Washington on April 12, 2006.

__/s Paul Arons_____
PAUL ARONS

**DECL. OF PAUL ARONS IN SUPPORT OF MOTION TO COMPEL FURTHER DISCOVERY: Page 3**



Legal Recovery Services, Inc.

| ARTICLES OF AGREEMENT |
| --- |

1. This agreement is made this the 8ᵗʰ day of Oct. , 1996 between Legal Recovery Services, Inc. (hereinafter referred to as LRS, Inc.) and Brenda Meadows doing business as Legal Recovery Services-Central California (hereinafter referred to as LRS-Central California).

2. LRS, Inc. hereby grants Brenda Meadows the exclusive rights to operate a check- management service and collection agency to be known as LRS-Central California, in the exclusive territory consisting of all of the following counties in the state of California: Santa Barbara, San Luis Obispo, Kern, Kings, Tulare, Inyo, Fresno and Madera, using the system, logo, programs (Software License Agreement ,Addendum B) and procedures developed by LRS, Inc..

3. With the exception of the Clients listed in 'Addendum A", all fees, commissions and damages collected for checks or accounts that are derived from merchant locations inside the LRS-Central California area by either party to this agreement are the property of LRS-Central California. All fees, commissions mid damages collected for any checks or accounts that are derived from merchant locations outside of the LRS-Central California area are the property of LRS, Inc. All checks (except for Clients listed in Addendum A) that may later come into the possession of LRS, Inc. that are derived from merchant locations inside LRS-central California area will be forwarded to the LRS-Central California office.

4. In consideration of the rights granted by LRS, Inc., LRS-Central California agrees to pay LRS, Inc. a monthly fee equal to a percentage of LRS-Central California preceding calendar months gross income derived from fees, merchant renewals and damages received from the Attorney Trust Account as follows:

   **REDACTED**

   a)   percent (   ) of the first            ᵗ or part of, each calendar month.
   b)   percent (   ) of the second           ᵗ or part of each calendar month.
   c)    and       . percent (   ⌄ of all over            each calendar month.

5. Either party shall have the right, at its own expense, to audit the records of the other party at any time with reasonable notice.

6. In order to enhance the reputation of and the trade demand for the service of the LRS, Inc. system, Brenda Meadows agrees as follows:

   a)   To operate, advertise and promote the check recovery business only under the name "Legal Recovery Services of Central California " or "LRS-CenCal' and not use the name "Legal Recovery Services, Inc." for any purpose unless LRS, Inc. shall first agree otherwise in writing.

   LRS-Central California BM        LRS, Inc.

# EXHIBIT 1

b)   To adopt and use the proprietary marks licensed hereunder solely in the manner prescribed by LRS, Inc., in any and all of Brenda Meadows' or LRS-Central California's advertising.

c)   To carry out the check recovery business and utilize said proprietary marks in accordance with the operational standards established by LRS, Inc. and to be bound by and comply with the attached attorney retainer agreement and all federal, state and local statutes, laws, ordinances and regulations.

7.   Brenda Meadows shall provide to LRS, Inc. proof that LRS, Inc. is named as co-insured on all insurance policies required herein below, a current list of all clients being serviced by the LRS-Central California office, and documentation to show that Brenda Meadows has filed and posted appropriate applications for a fictitious business name statement and a business license. In the event that the Bureau of Collections or its equivalent is re-instated Brenda Meadows agrees to immediately comply with all licensing requirements and to forward proof of such to LRS, Inc.

8.   Brenda Meadows agrees to indemnify and hold harmless from any liability, or damage LRS, Inc. may incur, including reasonable attorney fees, as a result of claims, demands, costs or judgments, of any kind or nature, by anyone ,whomsoever, arising out of, or otherwise connected with her ownership interest in the check recovery business, or her maintenance, or operation thereof. She also agrees to maintain public liability insurance against claims for personal injury, death or property damage suffered by others upon the business premises or occurring as a result of the maintenance or operation of any vehicle or facilities or as a result of the services rendered by her claims arising out of the business pursuant to this agreement, in the amount of           All such policies shall insure LRS, Inc. and protect LRS, Inc. against liability which may accrue by reason of this agreement, the licensed rights or the ownership, maintenance, or operation by Brenda Meadows of the check recovery business, Brenda Meadows' obligation to obtain and maintain the foregoing policy and policies of insurance shall not be limited in anyway by reason of any insurance which may be maintained by LRS, Inc. nor shall her performance of this obligation relieve her of liability under the indemnity provision set forth herein above. Brenda Meadows shall also maintain contents insurance on the LRS-Central California office in the amount of                                   ‹

9.   If Brenda Meadows receives from a third person and desires to accept a bona fide written offer to purchase her check collection business, LRS, Inc. shall have the option, exercisable within 45 days after written notice and receipt of a copy of such offer to purchase such business, on the same terms and conditions as offered by said third party. In order that LRS, Inc. may have information sufficient to enable it to determine whether to exercise its option, Brenda Meadows shall deliver to LRS, Inc. certified financial statements as of the end of Brenda Meadows' most recent fiscal year and such other information about the business and operations of Brenda Meadows as she has provided to such third party. If LRS, Inc. does not exercise its option., Brenda Meadows may, within 60 days from the expiration of the option sell, assign, and transfer her business to said party. Any material change in the terms of the offer prior to closing of the sale to such third party shall constitute a new offer subject to the same rights of first refusal of LRS, Inc. or its nominee as in the case of an initial offer. Furthermore, in no event shall Brenda Meadows make any public offer to sell, lease, transfer or assign her rights or interest under this agreement through any public medium without first giving 30 day written notice to LRS. Inc. Any sale or transfer of any part or all of the ownership of LRS-Central California that is the subject of this agreement, may be made only with the express permission of LRS,

REDACTED

LRS-Central California _BM_          LRS, Inc.

**EXHIBIT 1**

Inc., and must be with the condition that the new owner ,will accept the terms and conditions of this agreement.

10. To the extent that any documents are necessary to effectuate this agreement, each party agrees to execute and deliver such documents.

11. This agreement constitutes the complete agreement between Brenda Meadows and LRS, Inc. concerning the subject matter hereof and supersedes any prior agreements, if any. Neither Brenda Meadows nor LRS, Inc. shall change or modify this agreement unless the change or modification is in writing and signed by both parties to this agreement.

12. In order to enable LRS, Inc. to obtain financial information on an efficient basis, LRS-Central California shall use a generally accepted double entry accounting method of bookkeeping approved by LRS, Inc. Furthermore, Brenda Meadows and LRS-Central California agree to be bound by all provisions of the attached attorney retainer agreement and shall, on a weekly basis, deposit all moneys collected from check writers and accounts (excluding sign-up fees) into the currently existing LRS-Central California attorney trust account. All remittances to merchants shall be paid from said trust account in accordance with the attached attorney retainer agreement on a semimonthly basis. All fee income to Brenda Meadows and/or LRS-Central California shall be paid from said trust account in accordance -with the attached attorney retainer agreement on a weekly basis but only after all moneys owed to LRS, Inc. pursuant to Attachment A herein are first paid from said trust account. Furthermore, LRS-Central California shall submit to LRS, Inc. and the LRS, Inc. attorney, on a weekly basis, all bank deposit records and a record of all payments received (daily payment reports) during the preceding week and shall submit on a semi-monthly basis, a report of all remittances made to merchants (remittances reports) during the preceding two weeks. Upon request of LRS, Inc. LRS-Central California shall furnish more frequent reports by telephone or by other means of communication specified by LRS. Inc. Representatives of LRS, Inc. shall have the right at all reasonable times and without notice, to inspect LRS-Central California books and records.

13. LRS, Inc. agrees to provide any required software service to maintain the LRS, Inc. provided software in its present condition and to provide all future upgrades without additional charges. Any modification requested by LRS-Central California to the existing software shall be made only with prior express approval of LRS, Inc. and only by LRS, Inc. approved personnel. Charges for requested modification, data repair or hardware repair will be billed at the standard time and travel cost in effect at the time.

14. Brenda Meadows agrees that license to said proprietary marks is nonexclusive, and that LRS, Inc. in its sole discretion has the right to operate check recovery and collection businesses outside of the LRS-Central California service area and to grant licenses to others in, to and under such terms and conditions as LRS, Inc. deems fit subject to the provisions of this agreement.

15. LRS-Central California shall not, without prior written consent of LRS, Inc., engage in any activity which constitutes a conflict of interest with, or any activity in competition with, the activities of LRS, Inc.; it being understood that a "conflict of interest" and "in competition with" are defined as the check recovery business other than in accordance with the terms set forth herein. Brenda Meadows covenants that she shall not under any circumstances, disclose to any unauthorized party, or use in any other than the best interest of LRS, Inc., any of the trade secrets or confidential information of LRS,

LRS-Central California _____       LRS, Inc _____

**EXHIBIT 1**

Inc. herein divulged to, or acquired by them by virtue of the relationship between the parties herein. Brenda Meadows acknowledges that the rights granted by this agreement are for the purpose set forth herein, and no other purposes, and hereby covenants that during the term of this agreement and any extensions or renewals hereof and for a period of two years thereafter, regardless of the cause of termination (including sale), she shall not divert or attempt to divert any business or customer from LRS, Inc., nor shall she engage in, be employed or retained by, or have any interest direct or indirect in any check collection business within the LRS Inc. and Its affiliate licenses' service areas.

16. A failure by LRS, Inc. to exercise any right hereunder or otherwise waive or condone any delay or failure by Brenda Meadows to comply with any of the terms or conditions of this agreement shall not constitute a waiver of any such requirements or provisions, nor shall it waive LRS, Inc.'s right to terminate this agreement or exercise any other right of LRS, Inc. under this agreement.

17. If legal action is brought to enforce the terms of this agreement, the prevailing party shall be entitled to reasonable attorney fees.

18. This agreement does not authorize either party to act as an agent, legal representative, joint venture, partner, employee or servant of the other party for any reason whatsoever. Neither party has in any way the right or authorization to make any contract, agreement, warranty or representation on behalf of the other party.

19. This agreement shall bind and shall insure to the benefit of each party hereto their predecessors, successors in interest, heirs, affiliates, representatives, assignees, agents, officers, directors, employees, shareholders, members and personal representatives, past, present and future.

20. If any portion of this agreement is void or voidable under any California law or regulation, such voidability will not effect the balance of this agreement. This agreement shall be constituted under the laws of the State of California, and it is not the intention of either party to violate any laws or regulations,

**LRS-Central California**                    **Legal Recovery Services, Inc.**

Brenda Meadows                               Dagne Mecham

                                             Alan Mecham

LRS-Central California          LRS, Inc.

**EXHIBIT 1**



### Legal Recovery Services, Inc.

| **ADDENDUM A** |
| --- |

This Addendum is referred to as "Addendum A" in the agreement between Legal Recovery Services, Inc. (hereinafter referred to as LRS, Inc.) and Brenda Meadows doing business as Legal Recovery Services Central California (hereinafter referred to as LRS-Central California).

With the exception of the Clients listed in this "Addendum A", all fees, commissions and damages collected for checks or accounts that are derived from merchant locations inside the LRS-Central California area by either party to this agreement are the property of LRS-Central California. All fees, commissions and damages collected for any, LRS-Central California checks or accounts that derived from merchant locations outside of the LRS-Central California area are the property, of LRS, Inc. All checks (except for Clients listed in this -Addendum A) that may later come into the possession of LRS, Inc. that are derived from merchant locations inside LRS-Central California area will be forwarded to the LRS-Central California office.

Clients that are to remain the property of the LRS, Inc. office are as follows:

1. All Post Office accounts.
2. All Trader Joe's accounts.
3. All Lifetouch accounts.
4. All Howard & Phil's Western accounts.
5. All Cheaper! and Cigarettes Cheaper! store accounts.

This agreement is made this the _8TH_ day of _Oct._ , 1996.

**LRS-Central California**

Brenda Meadows

**Legal Recovery Services, Inc.**

Dagne Mecham

Alan Mecham

_LRS-Central California_ _BM_    _LRS, Inc._

## EXHIBIT 1

# LRS

## Legal Recovery Services, Inc.

### EXHIBIT A

1. All funds collected by LRS-Central California (excluding sign-up fees) shall be deposited by LRS-Central California into the Law Office trust account. Said funds shall thereafter be distributed by the Law Office from said account in the following order of payment:

2. All sums due to LRS-Central California merchants which have been received on collections not in suit, shall be paid according to the terms of the merchants contract with LRS-Central California on a semi-monthly basis.

3. All sums due to LRS, Inc. pursuant to the Articles of Agreement, shall be paid to LRS, Inc. on a weekly basis commencing the _____ day of _____ 1996

4. The Law Office shall be reimbursed for all bank charges charged by the bank against the Law Office trust account, as a result of the purchase of checks or resulting from NSF checks from LRS-Central California collections being deposited into said trust account.

5. **REDACTED** The Law Office shall receive ___% of the gross service charges, pre-suit treble damages and commissions received from debtors prior to court action, which amount shall be payable weekly based on the previous weeks service charges, pre-suit treble damages and commissions.

6. **REDACTED** The Law Office shall be paid ___% of all moneys collected and due to LRS-Central California, pursuant to the terms of the merchant contracts on account receivable collections where said moneys are collected prior to suit being filed, but after said collections have been Forwarded by LRS-Central California to the Law Office for individualized Law Office follow-through.

7. All moneys on collections after suit has been filed, shall be distributed on a weekly basis as follows

   a) **REDACTED** Moneys received on accounts receivable suits-all associated suit related costs shall be reimbursed to whoever paid those costs. Thereafter, all moneys received on accounts receivable lawsuits shall be distributed ratably according to the LRS-Central California contract -with the merchant, but with the Law Office receiving all attorney fees, and ___% of all moneys due to LRS-Central California under the merchant contracts.

   b) **REDACTED** Moneys received on check recovery suits all associated suit and related costs shall be reimbursed to whoever paid those costs. Thereafter, the check amounts plus applicable bank- charges shall be paid to the merchants. Moneys received thereafter, up to ___% of the statutory treble damage amount, shall be divided ___% to LRS-Central California and ___% to the Law Office. Moneys received thereafter shall be applied to statutory or court ordered attorney fees. Moneys received thereafter, shall be applied to the last ___% of the statutory treble damages, and distributed to LRS-Central California or the merchants as per the merchant contracts.

_LRS-Central California_ _____    _Law Office_ _____

**EXHIBIT 1**

c) Any additional moneys owed by LRS-Central California to the member-merchants pursuant to the terms of the LRS-Central California merchant contracts, shall be so distributed to said merchants on a semimonthly basis.

8. All funds collected by LRS-Central California ,which are not distributed as set forth in paragraphs 1 through 7, inclusive, shall be paid to LRS-Central California on a weekly basis.

9. The outside costs related to the lawsuits filed by the Law Office at LRS-Central California's request (i.e. court filing fees, process selling fees, sheriff fees, etc.). shall be advanced by the Law Office up to    % of the Law Office's paid share of service charges and commissions (delineated in paragraph 5 herein).

10. Any additional outside costs related to said lawsuit, shall be advanced by LRS-Central California or the merchants, depending upon the merchant agreements.

REDACTED

Paul Stassinos
On behalf of Law Office of Paul R. Stassinos


Brenda Meadows
On behalf of LRS- Central California


LRS-Central California _Bill_           Law Office_____

**EXHIBIT 1**

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4                     ---o0o---

 5   SUSANNE M. PALMER and SHARON

     HAMMER, on behalf of themselves,

 6   And others similarly situated,

 7              Plaintiffs,

 8        Vs.                      Case No. C04-03026 RMW

 9   LEGAL RECOVERY SERVICES, INC.,

     Et al.,

10

                Defendants.

11

                        /

12

13                     ---o0o---

14            DEPOSITION OF ADAM PERRY

15          THURSDAY, SEPTEMBER 29, 2005

16                  10:05 A.M.

17                     ---o0o---

18

19

     Reported By:  Lauri A. Gallagher, CSR No. 8726, RPR

20

21

22

23

24

25
```

**EXHIBIT 2**

Page 9

1    Q        What was your first job at Legal Recovery

2    Services, Inc.?

3    A        File clerk.

4  ' Q        Can you take me through the positions and

5    approximate dates you held those positions since you were

6    first hired as a file clerk?

7             MR. TERRILL:  Objection.  Calls for a narrative.

8             THE WITNESS:  I was a file clerk.  I did the

9    mail.  I did skip tracing.  I have done collections.  I

10   have done pretty much every job in the office at some

11   point in my long employment at Legal Recovery.  In '97 or

12   '96, I became the remote offices operations manager.  I

13   help support the remote offices.  And in '98, I became the

14   operations manager for Legal Recovery Services, Inc.

15   Q        When you were remote offices operations manager,

16   what remote offices were you working with?

17   A        We had software support for the office that was

18   in Modesto and Bakersfield and Southern California.

19   Q        Was there some third office besides Modesto and

20   Bakersfield office?

21   A        It was in Tustin -- Irvine, California.

22   Q        For how long was there an office in Irvine?

23   A        Four or five years, maybe.

24   Q        Was there an office in Irvine in 2001?

25   A        I don't recall.

**EXHIBIT 2**

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


SUSANNE M. PALMER,

    Plaintiff(s),

    vs.                    No. C 04-03026 RMW

PAUL R. STASSINOS.

    Defendant(s).

_____/




DEPOSITION OF PAUL STASSINOS

Sacramento, California

Friday, April 1, 2005

--oOo--



Reported by:

LISA RICHARDSON, CSR, RPR, CRR

CSR License No. 5883

Job No. 73414



2d68d083-ea08-4fc8-ba9c-a82eb0cd2ada

**EXHIBIT 3**

```
 1    have you also had about 500 to 1,000 check collection

 2    clients?

 3         A    Probably something in that neighborhood.

 4         Q    The clients are typically retail outlets

 5    catering to the public?

 6         A    The majority would be.

 7         Q    Have you ever figured out what the average

 8    check amount is of the checks that you collect on?

 9         A    Not really.

10         Q    About how many dishonored checks are you

11    collecting on at any one time?

12         A    What do you mean "collecting on"?

13         Q    Seeking to collect money on, whether through

14    letters, phone calls or lawsuits.

15         A    So by your definition, if no phone call,

16    letter or lawsuit is ongoing against a debtor, then

17    that's not collecting on.  Is that what you are saying?

18         Q    Well, let me approach it this way.

19              Do you have -- in your mind do you think of

20    having active accounts and inactive accounts?

21         A    Not really.

22         Q    At some point in time in the collection

23    process -- strike that.

24              About how many new check accounts do your

25    clients send you each week?
```

**EXHIBIT 3**

Paul Stassinos - April 1, 2005

Page 61

```
 1        A    On a daily basis I would say between 1 and
 2   300.
 3        Q    When you say 1, do you mean 1 or 100?
 4        A    Between 100 and 300.
 5        Q    Has that number held true for approximately
 6   the last four years?
 7        A    It would -- there is no way I could, I could
 8   say.  I could say it probably wouldn't be all that much
 9   off from that figure.  It would probably be somewhere
10   around that amount.  And I'm referring to workdays, by
11   the way, not weekends.
12        Q    And when a client sends a check to you for
13   collection, do they sometimes send a copy of the actual
14   check or the check itself?
15        A    They do send the actual check.
16        Q    Do clients ever refer an account for
17   collection through some means other than sending the
18   actual check; for instance, through transmitting data
19   electronically?
20        A    On rare occasion.
21        Q    So when you say you get 100 to 300 new
22   accounts each day, approximately, that means you are
23   getting 100 to 300 checks delivered to your office each
24   day?
25        A    That's correct.
```

2d68d083-ea08-4fc8-ba9c-a82eb0cd2ada

**EXHIBIT 3**

1    guess, then that's not what Mr. Arons wants you to do.

2    If you are going to give a legal opinion, I'm going to

3    instruct you not to because that's attorney work

4    product and seeks a legal conclusion.

5            THE WITNESS:  I don't know.  I cannot tell

6    what's in the teller's mind when they stamped the word

7    counterfeit on the check.

8        Q    BY MR. ARONS:  If counterfeit is stamped on a

9    check, does that affect the action your office takes in

10   collection?

11       A    Yes.

12       Q    And how does that affect the action your

13   office takes?

14           MS. COLEMAN:  Objection, attorney work

15   product.

16           I'm going to instruct him not to answer.

17       Q    BY MR. ARONS:  How does -- strike that.

18           About how long do you spend each day reviewing

19   checks?

20       A    On a weekly basis I believe I estimate it's

21   about five hours or so per week.  If you are talking --

22   when you say "reviewing checks," you are referring to

23   simply looking at the physical checks as opposed to

24   anything else relating to the checks?

25       Q    Yeah.  The process you just described.

**EXHIBIT 3**

1      A    Somewhere in the neighborhood of five hours

2   per week.

3      Q    That would be on 500 to 1,500 checks a week?

4      A    I believe so.

5      Q    Now, is data entry held up -- strike that.

6           Do you review the checks before data entry or

7   after data entry, or does it vary?

8      A    Initially I try to review the checks before

9   data entry, but it would create problems if I was away

10  from the office for the day.  And so now I review them

11  right after data entry, or within a day.  Or I try to

12  within a day.  If I'm on vacation then obviously I

13  cannot review them that day.  But I try to review them

14  on a daily basis.

15          MS. COLEMAN:  We've been going about an hour.

16  Can we take a break?

17          MR. ARONS:  Sure.  Then let's go for about a

18  half hour and take a lunch break.

19          MS. COLEMAN:  Okay.

20          (A break was taken.)

21      Q   BY MR. ARONS:  Mr. Stassinos, one of the

22  things you testified to is you looked to see -- when

23  you are reviewing a check to look to see if the check

24  is torn.  If the check is torn, would that affect your

25  office's handling of the account?

**EXHIBIT 3**

Page 76

1    have conducted this initial review of the check?

2         A    No.

3         Q    How do you physically get the checks to

4    review?

5         A    I take them out of a drawer and bring them

6    into my office and look at them --

7         Q    Who puts them --

8         A    -- one at a time.

9         Q    You take a batch of checks out of the drawer

10   and bring them into your office?

11        A    Yeah.  Generally one day's worth.  But if I've

12   missed a day then I will get two days' worth.

13        Q    Who puts the checks in the drawer?

14        A    I assume that that's data entry or some

15   ministerial person in the office.  I don't know exactly

16   who puts them in the drawer.  I'm not even sure who

17   alphabetizes them.

18        Q    Are the checks maintained alphabetically?

19        A    Yes.

20        Q    By day?

21        A    Yes.

22        Q    Are the checks put in the drawer before or

23   after the data entry clerk has entered data?

24        A    After.

25             MR. ARONS:  Off the record.

2d68d083-ea08-4fc8-ba9c-a82eb0cd2ada

# EXHIBIT 3

Paul Stassinos - April 1, 2005

Page 199

```
 1        A    The Modesto office was created first, so I
 2   guess it got dibs on Central Valley, or CV LRS is what
 3   it's called in short.  Bakersfield office opened later,
 4   and I guess it's in the central valley so it's called
 5   LRS CenCal.  They are two different offices.
 6        Q    Is LRS CenCal incorporated?
 7        A    So far as I'm aware.
 8        Q    Did you have anything to do with forming the
 9   corporation?
10        A    No.
11        Q    Didn't provide legal services?
12             MS. COLEMAN:  I'm sorry, vague and ambiguous.
13   Didn't provide legal services regarding what and to
14   whom?
15             MR. ARONS:  Formation of the corporation.
16             MS. COLEMAN:  Okay.
17             THE WITNESS:  I did not provide those
18   services, no.
19        Q    BY MR. ARONS:  Do you get paid by LRS CenCal?
20        A    No.
21        Q    Did I ask you about how many employees there
22   are in Bakersfield?
23        A    Yes, you did.  And I said it was approximately
24   the same as in the Modesto office, which I believe is
25   somewhere in the neighborhood of eight.
```

**EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


SUSANNE M. PALMER,

    Plaintiff(s),

    vs.                  No. C 04-03026 RMW

PAUL R. STASSINOS.

    Defendant(s).

_____/


DEPOSITION OF LEGAL RECOVERY SERVICES

By:  ALAN MECHAM

Sacramento, California

Monday, June 6, 2005

--oOo--


Reported by:

LISA RICHARDSON, CSR, RPR, CRR

CSR License No. 5883

Job No. 74035

1

**EXHIBIT 4**

1    proprietary business information.

2        THE WITNESS:  Yeah, it is.  It's software we

3    developed ourselves.

4        Q    BY MR. ARONS:  So you are not using commercial

5    collection software?

6        A    No.

7        Q    Have you given the program a name?

8        A    I have lots of names, yeah.  None that we need

9    to put in writing in here.

10       Q    Do you call it the collection program or do

11   you call it --

12       A    Sometimes.

13       Q    -- something else?

14       A    Yeah.  We can call it -- no.  We call it the,

15   we call it the LRS software.

16       Q    And this is -- one of the things this software

17   does is tracks collection activity?

18       A    Yes, it does.

19       Q    Is this the same software that triggers the

20   printing of letters?

21       A    Well, there I guess we get into a basic

22   difference of philosophy.  Computers are storage file

23   cabinets is all they are.  Somebody has to do something

24   to get the computer to do something.  There is no

25   answer to that question.

105

**EXHIBIT 4**

1    Q    Well, when someone executes a key stroke

2  instruction to send a letter, are they executing the

3  key stroke instruction for the LRS software?

4    A    Yes.

5    Q    And when there's a second or perhaps a third

6  letter generated at a predetermined point in time, are

7  the instructions to send the letter at the

8  predetermined point in time stored in the LRS software?

9    A    Yeah, they would be.

10    Q    And someone at LRS programmed the computer to

11  send it at whatever interval the letter is sent.

12    A    That's correct.

13    Q    What information -- strike that.

14         What information is the LRS software

15  programmed to generate reports on?

16         MR. TERRILL:  Objection, calls for a

17  narrative.

18         THE WITNESS:  Yeah.

19         MR. ARONS:  Let me break it down.

20    Q    Can the LRS software generate a client list?

21    A    Yes, it can.

22    Q    Can it generate a list of -- strike that.

23         Can it generate a count of how many checks

24  were entered on the computer during a particular period

25  of time?

                                                      106


**EXHIBIT 4**

1     A    Yes, it can.

2     Q    Can it generate a count of how many of a

3   particular kind of letter were sent during a particular

4   time period?

5     A    Yes, it can.

6     Q    Can it generate a total of money collected

7   during a particular time period?

8     A    Yeah.

9     Q    Now, when payment information is entered into

10  the computer, is it broken down into various items such

11  as check amount, or service charge, or interest?

12        MR. TERRILL:  Objection, compound.

13        THE WITNESS:  Yeah.  The computer program can

14  break that out.

15    Q    BY MR. ARONS:  So -- well, let me -- okay.

16  And is it possible to generate a report that shows a

17  total for a certain item having been collected during a

18  particular time period?  For instance, can you show how

19  much in the -- strike that.  Let me ask an intelligible

20  question.

21        Can you generate a report that shows how much

22  total service charges were collected during a

23  particular time period?

24    A    Yeah.

25    Q    Can you generate a report -- strike that.

                                                      107

**EXHIBIT 4**

1          At least through the end of 2004, could you

2     generate a report that would show how much total

3     interest was collected during a particular time period?

4          A   I believe so.

5          Q   Do you know if any summaries of the collection

6     activity generated in an LRS software report have been

7     maintained?

8              MR. TERRILL:  Objection, vague as to

9     "maintained."

10             THE WITNESS:  Yeah, what do you mean?

11         Q   BY MR. ARONS:  In generating a report, does

12     the report get printed out?

13         A   Which report is that?

14         Q   Any of the reports that would be generated

15     from the LRS software.

16         A   Yeah.  I mean, there wouldn't be much point in

17     having a report in there if we couldn't print it out,

18     would there?

19         Q   Have any of the reports that have been printed

20     out been saved?  Do they still exist?

21         A   We try to get rid of everything we can.

22         Q   Well, have any of the reports that have been

23     printed out been saved?

24             MR. TERRILL:  At what point in time?

25             MR. ARONS:  Ever.

108

**EXHIBIT 4**

1   Mark E. Ellis - 127159
    June D. Koper - 191890
2   MURPHY, PEARSON, BRADLEY & FEENEY
    701 University Avenue, Suite 150
3   Sacramento, CA 95825
    Telephone:    (916) 565-0300
4   Facsimile:    (916) 565-1636

5   Attorneys for Defendant
    PAUL R. STASSINOS
6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11  SUSANNE M. PALMER and SHARON            Case No.:         C04 03026 RMW
    HAMMER, on behalf of herself and all others   Related Actions:   C04 03027 RMW
12  similarly situated                                                C05 02280 RMW

13           Plaintiff,                      **OPPOSITION TO SUPPLEMENTAL
                                             BRIEFING SUPPORTING CLASS
14  v.                                       CERTIFICATION PURSUANT TO THE
                                             COURT'S JANUARY 12, 2006 ORDER**
15  PAUL R. STASSINOS, an Individual and DOES
    1 through 20,
16
             Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

                                  - 0 -

**EXHIBIT 5**

## I.    **INTRODUCTION**

The Court requested that the parties provide further briefing as to the typicality element of class certification in that plaintiffs failed to provide any information on which the Court could make a determination as to the typicality element. (See, e.g., **Byes v. Telecheck Recovery Services, Inc.** (E.D. La. 1997) 173 F.R.D. 421, 425.) The Court also requested that the parties brief the issue of the **FRCP 23(b)(3)** superiority element in that plaintiffs' request for class certification contemplated claims that were dismissed by the Court. Upon a closer examination of typicality, the circumstances of this case dictate that the Court deny the motion for class certification.    Similarly, plaintiffs cannot establish the **FRCP 23(b)(3)** predominance and superiority requirements, and thus the motion for class certification must also fail for this reason.

## II.    **LEGAL ANALYSIS**

### A.    **Plaintiffs Have Not Established Typicality.**

As plaintiffs point out, the main principle behind typicality is that the plaintiff will advance the interests of the class members by advancing her or his own self-interest. The alignment of interest is not the test for typicality. It is the result.  The plaintiffs and class members have similar interests because they have similar claims. The plaintiff whose claim is typical will ordinarily establish the defendants' liability to the entire class by proving his or her individual claim. (6 Newberg, Herbert & Conte, Alba, **Newberg on Class Action** (4th ed. 2002) p. 29, § 18.8.) In other words, to meet the typicality requirement, the named representatives must be able to establish the bulk of the elements of each class member's claims when they prove their own claims. (**General Tel. Co. of Southwest v. Falcon** (1982) 457 U.S. 147, 157-58.) In other words, the named representatives must be able to establish the bulk of the elements of each class member's claims when they prove their own claims.. (**Brooks v. Southern Bell Tel. & Tel. Co.** (S.D. Fla. 1990) 133 F.R.D. 54, 58 (citing **General Tel. Co. v. Falcon** (1982) 457 U.S. 147); see also **In re Merrill Lynch** (D.N.J. 1999) 191 F.R.D. 391, 397-98; **Am/Comm Systems, Inc. v. American Tel. & Tel. Co.** (E.D. Penn. 1984) 101 F.R.D. 317, 321; **Fruchter v. Florida Progress Corp.** (Fla. Cir. Ct. 2002) 2002 WL 1558220, *5.)  Courts have repeatedly held representatives' claims to be atypical if they are grounded in factual situations differing from those of other class members. (See, e.g., **Alexander v. Gino's, Inc.**, 621 F.2d 71 (3rd Cir.1980), cert. denied, 449 U.S. 953 (1980).)  The purpose underlying the typicality requirement that liability as to plaintiff will necessarily establish liability as to

- 1 -

**EXHIBIT 5**

the entire class was explained by the United States Supreme Court in the **Falcon** case.  The **Falcon** Court noted

that the typicality requirements help insure that the class action is economical and that the interests of other class

members are fairly and adequately protected.  (**Falcon**, *supra*, 457 U.S. at 157, n. 13.)

**1.    Plaintiffs Cannot Establish Typicality When the Class Is Defined to Include an Unknown Number of Letters and Plaintiffs Cannot Establish that All Class Members Received Any Single Letter.**

Applying these principles to the FDCPA context, courts have denied certification when the plaintiff

seeks to represent a class regarding more than one letter when the entire class has not received all letters or when

the alleged violations differ from letter to letter.

In **Byes v. Telecheck Recovery Services, Inc.** (E.D. la. 1997) 173 F.R.D. 421, the Court denied

plaintiff's motion for class certification for a variety of reasons, including a lack of typicality.  In **Byes**, the

plaintiff received five letters, and sought certification on behalf of all persons who were sent these five letters,

which plaintiff claimed violated the FDCPA.  Defendants sought to collect debts owed arising from two

bounced checks, which plaintiff claimed was the result of identity theft.  The **Byes** Court held:

> Byes received all five letters.  The fact that all five letters are alleged to violate three of the same sections of the FDCPA, does not establish typicality in view of the variations in each letter's content, the other alleged violations which are different for each letter, and that all class members did not receive all five letters.  Furthermore, the class is defined as persons who were sent letters.  Class members who never received their letters would not have claims typical of Buyes who received all five letters.  ¶¶  Considering these facts, the court finds that Byes has failed to show that her claims are typical of the proposed class members.

(*Id.* at 425; see also id. at 423 (plaintiff failed to establish commonality because plaintiff failed to establish that

all putative class members had received at least one of the five letters received by plaintiff); **Sandlin v. Shapiro**

**& Fishman** (M.D. Fla. 1996) 168 F.R.D. 662, 667-68 (plaintiff found to be atypical because plaintiff had not

paid the alleged improper charges, but sought to represent a class that had).)

Similarly, in **Jones v. Roy** (M.D. Ala 2001) 202 F.R.D. 658, the Court denied class certification for a

variety of reasons, including a failure to establish typicality.  Plaintiff sought to certify a class as to five or six

letters, only one of which she had actually received. All of the letters plaintiff sought to include within the class

definition contained a reference to Corporate Collection Center.  Plaintiff alleged that this reference was a

violation of **§ 1692e(14)** of the FDCPA, one of the violations plaintiffs allege in the instant lawsuit, because the

Corporate Collection Center did not exist and did not send the letters.  Only 20 people received the letter that

plaintiff had actually received.

**EXHIBIT 5**

Plaintiff also alleged that 2 of the letters of the six letters violated **§ 1692g** of the FDCPA, one of the violations plaintiffs alleged in the instant lawsuit. The two letters have variations in language. Again, plaintiff had only received one of the two letters. The Court explained:

> [A]lthough Plaintiff characterizes the letters involved as differing only with regard to the addressee and the amount owed, there are clear substantive differences between the two letters sent by Roy. Plaintiff received a letter which is identical to that received by only 20 of the "thousands" of members he seeks to represent. Plaintiff never received a letter from Olsten and has no idea as to the content of the letters from Olsten. In light of the substantive variations in the letters, the fact that the class members within each subclass received different letters, and the fact that Plaintiff received a single letter substantively identical to only 20 of the proposed class members, the court finds that Plaintiff's claims are atypical of the class.

(*Id.* at 662.)

And in **Dalton v. FMA Ents, Inc.** (M.D. Fla. 1996) 1996 WL 379105, the Court also took issue with plaintiff's attempt to certify a class of persons who were sent various letters which plaintiff debtor alleged violated the FDCPA when the letters were all signed by an attorney, who plaintiff debtor claimed lacked involvement in the collection activity, just as plaintiffs claim in the instant case. Plaintiff Dalton argued that typicality was established because each of the class members received an "attorney letter" as did plaintiff Dalton and that the class claims arise from the same practices that give rise to Dalton's claims, as do plaintiffs in the instant case. The **Dalton** Court rejected Dalton's argument: "Plaintiff fails to establish which members of the potential class received which lettes offered as exhibits. Therefore, this Court cannot establish which members' claims are typical of Plaintiff's." (*Id.* at *5.)

For these same reasons, class certification as to plaintiffs' proposed class should be denied. Plaintiffs' claims cannot be said to be typical of those members of the huge class proposed in the present case. Plaintiffs propose the following class definition:

> All persons to whom defendant mailed at lease one collection letter since July 27, 2003, containing the same or similar demands or representations to those in the letters defendant sent to named plaintiff(s) in an attempt to collect a dishonored check written in California for personal, family, or household purposes.

The above class definition would not only encompass the two letters plaintiffs' counsel attached to his declaration,[1] as Exhibit 5 and 6 to support plaintiffs' motion for class certification, and the two additional letters

---

[1] Notably, the declarations submitted by plaintiffs do not authenticate the collection letters they received from Attorney Stassinos. Rather, plaintiffs' counsel authenticates only two of the four letters attached to the Complaint.

**EXHIBIT 5**

attached to the complaint as Exhibits 2 and 4, but other letters not received by plaintiffs. Mr. Stassinos sends four *series* of letters to debtors with dishonored checks. (Stassinos Depo., **Exhibit A**, pp. 84:14-85:3; see also *id.* at p. 85:4-12 (Mr. Stassinos opines that in his legal opinion, different letter series are used because "[d]ifferent checks are required to be dealt with in different manners.").) Plaintiffs have not claimed to have received or been sent each of the letters in these four series of letters. Nor have plaintiffs attempted to clarify whether the class members received all letters received by plaintiffs or identified in the class definition. In fact, the two plaintiffs who seek to act as class representatives have not even received the same letters. As in **Byes**, **Dalton**, and **Jones**, this Court should deny class certification because plaintiffs cannot establish typicality.

### 2. The Class Claims Differ for Plaintiffs' Claims.

Typicality fails if different circumstances between the class and the class representative require an individualized determination as to liability, such as when the class representative's claims are subject to a factual situation that presents the possibility of unique legal arguments or defenses. For instance, in **Hall v. National Recovery System** (M.D. Fla. 1996) 1996 WL 467512, the Court analyzed whether typicality existed in an FDCPA case involving a claim that the debt collector had threatened to return the account to its client creditor for referral to the State Attorney's Office for prosecution. In some instances, this would be done. In other instances, the debt collector would continue to collect on the account. And in still other situations, the debt collector would refer the account to another debt collector. The **Hall** Court found that typicality was absent in such a case where the factual circumstances that would establish liability varied:

> This Court agrees with Defendant and finds that the typicality requirement is not met. 'The typicality provision requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff.' Furthermore, 'the typicality requirement ... focuses on whether the plaintiff's claims have the same essential characteristics of the class at large.' ¶ It is not clear from the class definition whether the proposed class members actually received the letters sent [by the debt collector]. **Moreover, even if the letters were received, the actions taken by Defendant with regard to those letters differed from member to member.** Plaintiff has failed to establish [the debt collector's] intent regarding the potential class members. This Court finds that this claim involves more individual issues than common ones. Defendant's intent may well have differed regarding invididal class members.

(*Id.* at *4 (emphasis added) (citations omitted); see also **Wiener v. Bloomfield** (S.D.N.Y. 1995) 901 F.Supp. 771, 777 (finding that plaintiff must prove that debt collector threatened to take action which they did not intend to take); **West v. Costen** (W.D. Va. 1983) 558 F.Supp. 564, 573 (decertifying class as to claim of threatened arrest because it would vary from class member to class member).)

- 4 -

## EXHIBIT 5

1 Here, plaintiffs seek to certify a class as to the issue of whether Attorney Stassinos mislead debtors as to

2 his level of involvement in the collection process. Attorney Stassinos does review each dishonored check to

3 evaluate the action that should be taken. And depending on that review, Attorney Stassinos takes additional

4 steps should the information gleaned from the dishonored check so warrant. (Stassinos Depo., pp. 66:25-67:8,

5 68:8-11, 69:21-70:1, 73:25-75:1; 77:5-78:13; 93:11-95:25.) Since Mr. Stassinos's actions vary as to the

6 circumstances of each debtor, the allegations that Mr. Stassinos's letterhead raises a false inference for the

7 debtor who receives the letter lack typicality as they did in **Hall**. For these reasons, this Court must deny

8 plaintiffs' motion for class certification.

9 **B. Plaintiff Has Not Shown that Common Issues of Law and Fact Predominate Such That Litigating This Case as a Class Action Would Be Superior to Other Methods of Adjudicating These Claims.**

10

11 One of the issues that courts examine when determining whether it would be superior to litigate a case

12 as a class action is the interest of members of the class in individually controlling the prosecution of separate

13 actions. (**Fed. R. Civ. Proc. 23(b)(3)**.) "[W]hen the complexities of class action treatment outweigh the

benefits of considering common issues in one trial, class action treatment is not the "superior" method of

14 adjudication. … If each class member has to litigate numerous and substantial separate issues to establish his or

15 her right to recover individually, a class action is not 'superior.'" (**Zinser v. Accuflix Research Inst., Inc.** , (9[th]

16 Cir. 2001) 253 F.3d 1180, 1192.)

17

18 In **Graybeal v. American Savings & Loan Ass'n**, (D.D.C. 1973) 59 F.R.D. 7, 16, the Court, which

had rejected certification based on predominance, also rejected certifying a class because a class action was not

19 a superior vehicle to litigate the case. The **Graybeal** Court explained:

20

21 As quoted above, **Rule 23(b)(3)** requires, in addition to commonality of questions of law or fact, that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." Such superiority is lacking in the instant case.

22

23 The use and misuse of **Rule 23**, and the complex problems attendant thereto, have been the subject of great concern in recent years by both the bench and bar. For example, the Report and Recommendations of the Special Committee on Rule 23 of the Federal Rules of Civil Procedure of the American College of Trial Lawyers contains the following observation at pages 5 and 6.

24

25 ".... Rule 23, as written and as applied over the last half decade, has failed to achieve its purposes. We suggest that in the areas of judicial economy and fairness to the parties, the experienced results have been directly contrary to the intended purposes. The (b)(3) class suit has mandated heavy expenditures of judicial time, effort and expense. The expenditures have been sustained only by sacrificing procedural and substantive fairness to the party opposing the class. Nor does it appear that these burdens can in any sense be justified by the limited benefits accruing to class claimants."

26

27

28

- 5 -

**EXHIBIT 5**

> The problems of "judicial economy and fairness to the parties" are certainly present in the case at bar. As the Court has previously noted, the essential questions of fact herein are individual in nature and can only be fairly and judiciously resolved on a case by case basis.

(**Graybeal v. American Savings & Loan Ass'n**, (D.D.C. 1973) 59 F.R.D. 7 16.)

Against this policy backdrop, it is clear that litigating this case as a class action is not a superior method. There are just too many issues that predominate that must be determined on an individual basis. Necessarily, in that the plaintiffs cannot prove liability on letters that were not sent to them, those claims will need to be individually determined. Additionally, pursuant to plaintiff's theory of liability, since Mr. Stassinos varies his analysis and review of matters referred to him based on the legal issues they present (see Stassinos Depo., pp. 66:25-67:8, 68:8-11, 69:21-70:1, 73:25-75:1; 77:5-78:13; 93:11-95:25 (describing differences in approach depending on whether the dishonored check results from a stop payment notice or appears to be fraudulent, to name a few)), presumably liability determinations on the alleged "attorney involvement" claim will involve an individual determination. Simply put, the issues discussed above that defeat typicality create individual issues which ultimately predominate.

In addition to those issues, the class definition involves debtors subject to a court judgment which finally determined the issue of the amount of pre-judgment interest. These putative class members would be subject to individual defenses for res judicata and collateral estoppel, as the Court previously recognized in its Order Granting in Part Defendant's Motion for Reconsideration. Additionally, damages would need to be determined on an individual basis. Likewise, whether the debtor is a consumer within the definition of the FDCPA will also necessarily need to be determined on an individual basis. When taken as a whole, all of these individualized issues predominate, defeating the superiority of a potential class action.

And although certainly there is a place for class actions which seek a de minimus recovery for each class member, a class action is not the only avenue for the class members. In fact, a putative class member could receive a greater recovery by pursuing the matter on an individual basis. If liability was determined, a class member could expect to receive actual damages, amounting to a de minimus amount of interest actually paid, plus statutory damages of up to 1% of net worth. Therefore, if Mr. Stassinos is worth $1 million, which is purely a hypothetical, the class could potentially receive up to $10,000 in total if liability is established. If the class contains tens of thousands of class members as plaintiff emphatically states in the Motion for Class

Opposition To Supplemental Briefing Supporting Class Certification Pursuant To The Court's January 14, 2006 Order

**EXHIBIT 5**

1 | Certification, p.10, then the class would receive, at best 50 cents. ($10,000 maximum statutory damages ÷ at

2 | least 20,000 class members = no more than 50 cents per class member.)

3 | In contrast, if a class member sued individually, and liability was proven, the individual plaintiff would

4 | be entitled to up to $1,000 in statutory damages. (**15 U.S.C. § 1692k.**) Thus, by certifying the class, the Court

5 | is effectively limiting the recovery of each class member to no more than 50 cents when they could possibly

6 | recover $1,000 in an individual action. Moreover, there is no disincentive to litigating one's own case with a

7 | $1,000 recovery in that the FDCPA provides for attorneys' fees. (**15 U.S.C. § 1692k(b).**) Plaintiff FDCPA

8 | attorney's take cases with no charge to the plaintiffs because they plan to recover costs from the defendants.

9 | This is true in this case. (*Palmer Decl.* ¶ 7.)

10 | Although dealing with a Truth in Lending Act claim, **Parker v. George Thompson Ford, Inc.,** (N.D.

11 | GA 1979) 83 F.R.D. 378, is right on point. In **Parker**, the Court refused to certify a case as a class action when

12 | the statutory damages available to class members was less than their potential recovery as individual plaintiffs.

13 | (**Parker,** *supra*, 83 F.R.D. at 382 (class certification would result in each class member recovering less than

14 | $100 where $100 was the *minimum* statutory damages for an individual case).) In the instant case the difference

15 | in recovery is far greater. As individuals the putative plaintiffs could recover up $1,000, however, as class

16 | members they will recover at most, 50 cents.

17 | Furthermore, class certification should be denied because the only people that will benefit from this

18 | lawsuit is plaintiff's attorneys. (*See* **In re Hotel Telephone Charges** (9th Cir. 1974) 500 F.2d 86, 90-91.)

19 | Should this case be certified as a class action and proceed as such, it will have the only effect of increasing the

20 | attorney's fees generated by plaintiff's three counsel. Admittedly, the **In re Hotel** case is distinguishable from

21 | the case at hand in terms of the complexity of the litigation and the burden it would impose on the Court.

22 | However, the reasoning applies equally to this case. "Whenever the principal, if not the only beneficiaries to the

23 | class action are to be the attorneys for the plaintiffs and not the individual class members, a costly and time-

24 | consuming class action is hardly the superior method for resolving the dispute." **In re Hotel,** *supra*, 500 F.2d at

25 | 91.

26 | When the purported class members will not receive any real benefit, and the driving force behind class

27 | certification is the generation of attorney's fees, certification is not a superior method for resolving the dispute.

28 | (*Id.*) Here, there can be no dispute that the principal beneficiaries of class certification will be plaintiff's

Opposition To Supplemental Briefing Supporting Class Certification Pursuant To The Court's January 14, 2006 Order

**EXHIBIT 5**

1  attorneys who will insist on participating and directing class notification all the while increasing their fees.

2      The mere fact that the FDCPA allows for enforcement through class actions does not lead to the

3  conclusion that Congress supports the outcome in which a class would be certified awarding plaintiff less than a

4  quarter dollar apiece.  Indeed the opposite can be inferred from the statute.  The fact that the statute allows for

5  attorney's fees for a successful plaintiff indicates that Congress recognized the problem of individual

6  enforcement and remedied the situation by allowing the recovery of fees and costs by a successful plaintiff.

7      Simply put, plaintiffs cannot show superiority, nor can they establish predominant common issues given

8  the multiple letters and dissimilar facts as discussed above, not be mention the calculation of damages.  For all

9  of these reasons, this Court should deny plaintiff's motion for class certification.

10                          **III.    CONCLUSION**

11     Attorney Stassinos respectfully request that this Court find that plaintiffs lack typicality with the

12  putative class members and that the proposed class action does not have predominate common legal and factual

13  issues, nor is it a superior method of litigation these claims.  For all these reasons, this Court should deny

14  plaintiffs' Motion for Class Certification.

15  Dated: February 8, 2006

16                          MURPHY, PEARSON, BRADLEY & FEENEY

17

18                          By _____
                                June D. Koper
19                              Attorneys for Defendant
                                PAUL R. STASSINOS

20

21  JDK.10307434.doc

22

23

24

25

26

27

28

                              - 8 -

# EXHIBIT 5